WELTY, Respondent, vs. THE LAKE SUPERIOR TERMINAL & TRANSFER RAILWAY COMPANY, Appellant.

*May 5 — June 23, 1898.*

(1–8) *Master and servant: Personal injuries: Defective appliances; Credibility of witnesses: Court and jury: Suppression of evidence: Presumption of negligence: Instructions to jury: Fellow-servants.* (9) *Jurors: Amendment of statutes.*

1. The credibility of the plaintiff as a witness in his own behalf in an action for personal injuries is peculiarly a question for the jury.

2. In an action for injuries to an employee operating a semaphore, alleged to have been caused by a rung coming out of the pole, which he had climbed to relight a lantern, he testified, among other things, that he was standing on one of the rungs with his right foot, with his left leg and left arm around the pole and the lantern in his left hand, and was scratching a match with his right hand, two fingers of which were grasping the rung in question, when the rung came out and he was precipitated backward; that his overcoat was caught by one of the rungs and he was turned over, but caught a lower rung and regained a footing on the pole before reaching the ground; that this occurred about 11:30 P. M. on a dark night; that, though hurt, he went to the depot eighty rods distant and took care of two passenger trains, and then returned and drove the rung into the pole. The testimony was conflicting as to whether the rungs had originally been driven into the pole in defendant's shop or after the pole was raised. Plaintiff claimed that his fall had caused a rupture. *Held,* on the evidence, that the questions of fact as to the receipt of the injury, its proximate cause, and the negligence of the parties were properly left to the jury. BARDEEN and MARSHALL, JJ., dissent, on the ground that plaintiff's own testimony demonstrated the impossibility of his being injured in the manner claimed.

Welty vs. The Lake Superior Terminal & Transfer R. Co.

3. The fact, testified to by plaintiff, that about three quarters of an hour after the injury he drove the rung securely into the post again does not of itself warrant the conclusion that he purposely attempted to suppress or destroy the evidence to show how his injury occurred.

4. It was not an error prejudicial to defendant to instruct the jury, in effect, that the fact, if it was a fact, that the rung came out in the manner testified to was presumptive of the want of ordinary care on the part of defendant, that is to say, if there were no other evidence as to how the semaphore was constructed and the degree of care exercised in putting in the rung, the conclusion that it was imperfectly constructed would follow from the fact of the rung being loose when plaintiff took hold of it, if in fact it was loose, as he testifies.

5. Nor was it error prejudicial to defendant to charge, in effect, that, though the testimony of a witness was uncontradicted, if the things testified to were so unnatural or unreasonable that the good sense of the jury revolted against them they *might* reject such testimony as untrue, where the court afterwards instructed the jury, at defendant's request, that if they found from the evidence that plaintiff's testimony as to the manner of his falling was against all reasonable probabilities they *would not be warranted* in finding that he fell from the pole and received the injuries complained of.

6. It was not error to refuse to instruct the jury, at defendant's request, that if the plaintiff had equal means and opportunity with the defendant for ascertaining the defect in the semaphore then he could not recover.

7. It was the duty of the defendant to construct the semaphores so that they would be reasonably safe for the plaintiff's use.

8. A foreman and his assistants under and by whom the semaphores were constructed and erected were not fellow-servants of one engaged in operating the semaphores.

9. Jurors drawn and designated according to law to serve at a term of court will continue legal jurors for the term unless excused or discharged by the court, notwithstanding a change in the method of drawing jurors by a statute taking effect after said jurors were drawn and before the commencement of the term.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. *Affirmed.*

Action to recover damages sustained by the plaintiff in consequence of personal injuries received by him while en-

gaged in the employ of the defendant as a semaphorist on its line of road at Superior, Wisconsin, and caused, as it is alleged, by the negligence of defendant.

The complaint alleges that, for the purpose of giving necessary signals by day and by night to govern and regulate the movement and direction of certain trains running in said city, the defendant had, at the time of the plaintiff's injury, and for a long time prior thereto had had, in use, and maintained, signal appliances called "semaphores," in said city, one of which was at the crossing of its railroad and the railway of the Eastern Railway Company of Minnesota, at the north side of its yard; that said semaphores consisted of telegraph poles about thirty feet long, set in the ground and standing upright, with a cross-arm or blade at or near the top of said pole, fastened near or at the center of said blade or cross-arm to said pole, so that said cross-arm would swing in certain positions; that from each end of said cross-arm or blade was suspended a red light, and these appliances or semaphores, by the different position of the cross-arms or blades, signal to and govern the movement of trains by the position of the blades by day and of the lights by night; that at the crossing of the *Lake Superior Terminal & Transfer Railway Company* and the Eastern Railway of Minnesota, at the north side of defendant's yards, one of said semaphores had been erected, and was in use by the defendant, and up the sides of said pole, for the use of the person lighting said semaphore lights at night, a distance apart of about four feet on each side, there were iron rungs about a foot in length, with the ends of said rungs turned up about an inch, which were driven into the poles; that on or about the 16th of June, 1894, the plaintiff was employed by the defendant to work for it as a switch tender, and he continued in such employment until November 27, 1895, when he was set by the defendant at additional work at the said semaphores, without any previous knowledge or experience therein, as the defend-

ant well knew, and was ordered to perform the additional duties of a semaphorist without any instructions as to the mode of performing such duties, and without any warning as to the dangers incident thereto; that in said employment it was and became the duty of the plaintiff to clean the lanterns or lights, and keep the same filled with oil, and to place them in position at the end of the blades at the top of said poles, and to see that they were kept burning, and that proper signals were given by them to incoming and outgoing trains; that it frequently occurred, when the night switchmen of the different roads used the lever to place the semaphore in position, that they handled them so roughly that the lights were extinguished, and that it was then the duty of the plaintiff to relight them.

The complaint then alleges that on or about December 28, 1895, at Superior aforesaid, and while the plaintiff was engaged in his said duties, one of the lights upon the semaphore at the north side of defendant's yard at said crossing became extinguished, and while the plaintiff was climbing the pole to relight the light, and while in the exercise of ordinary care, caution, and prudence on his part, one of the rungs on said semaphore, and near the top thereof, to which the plaintiff was required to cling, and at the time was clinging, came out, and by reason thereof the plaintiff was thrown and fell from his place, causing the injuries of which he complains. It was charged that the defendant was careless and negligent, in that the rung in the pole to which plaintiff was required to cling when lighting said lamp was insecurely fastened and loosely placed in said pole, so that when the plaintiff caught hold of it it loosened, turned around, and came out; that the defendant entirely failed to furnish plaintiff with a reasonably safe place in which to work, and with reasonably safe appliances with and about which to work, and sent him into such dangerous and unsafe place without informing him of the risks and dangers connected

therewith; that plaintiff was ignorant of the dangers attendant upon said work, and with the manner in which said rung was fastened, and believed the same was free from dangers and defects; that the defendant at the time of said accident knew, and by the exercise of reasonable and proper care, tests, and inspection could have known, the aforesaid dangers and defects, and could have remedied the same before the accident, but carelessly and negligently omitted to do so. It is then alleged that by reason of the premises, the negligent and careless and defective construction of said semaphore, and negligence in failing to warn plaintiff of such defective construction, the defendant failed and omitted to furnish plaintiff with a reasonably safe place in which to work, and with reasonably safe appliances with and about which to work, in consequence of which the plaintiff fell from said semaphore, and became ruptured in the left groin, and received a severe wrench of the spine, causing severe injuries, and he received a shock to his whole system, so that he has been rendered utterly incapable of performing his accustomed duties, and had suffered, and still continued to suffer, severe pain and anguish, and would so suffer as long as he lived; that at the time he was earning and capable of earning a salary of $780 a year, and that he had paid out large sums of money for medical care and treatment, and that he was now, in consequence of said injury, totally incapacitated to work or to earn money as he was prior to said accident, and as he would be but for such injuries; and he claimed damages in the sum of $20,000.

The answer of the defendant was a general denial, admitting that plaintiff was in its employ, but alleging that, if injured at all, it was by reason of his own carelessness and negligence and the carelessness and negligence of his fellow-servants and co-employees.

At the trial, before the court and jury, evidence was given tending to show that the plaintiff had been examined by a

physician and surgeon as to whether he had a rupture or hernia or not; that on a subsequent examination, about three months afterwards, he was found to be suffering from hernia of the left groin of about the size of a pear. It was not protruding out. Plaintiff's counsel asked the witness to state what were the dangers reasonably resulting from hernia such as the plaintiff had. The defendant objected, but the objection was overruled. The witness answered that the danger was of its becoming larger by any sudden force being used on the abdomen, and thus causing strangulation, and, if not relieved, strangulation would cause death in time; that strangulated hernia is not a very common occurrence, and was comparatively easily relieved when attended to in time,— when the patient is seen in time,— but it may produce death if not taken in time; the patient should be seen in from twenty-four to twenty-eight hours.

The plaintiff testified that he commenced work as a semaphorist November 25, 1895; that he received a book of instructions stating the position to set the semaphore for the different trains; that this was all the instruction he had; that it was his duty to set the semaphore at the yardmaster's office for all passing trains, also to set it for passenger trains; if a light went out, he was to light it; that he was injured on the night of December 28, 1895, about half past 11 o'clock; there were two passenger trains due at 11:38,— the Great Northern and St. Paul & Duluth,— and he had to set the semaphore for each of those passing trains; a freight train from the Great Northern elevator went by the semaphore he had to set for the passenger train, and when a switchman threw the light he extinguished one of them, so that he had to go there, a distance of eighty or one hundred rods from where he then was, and light that light again before the passenger trains came in; and he went accordingly. This was about half past 11 o'clock. "I went over and climbed up the pole. It was a wet night,— kind of sleety like.

Reached out, and got the lantern; took the bottom of the lantern out, and stood on one of those rungs with my right foot, and put the left leg around the pole, and put my arm around and took the bottom of the lantern in the left hand, my left arm around the pole. I reached out and got the bottom of the lantern with my right hand, and brought it in, and held it with my left hand; took a match out of my coat pocket, and lit it on the rung. I had hold of the part of the rung that turned up with my little finger and the one next to it. I was around the pole, and was in a hurry. I suppose I was a little nervous, and lit a couple of matches, and this pin turned down and came out very nearly; seemingly pretty near so easy that I started to fall back, and I hung on with my left leg as long as I could, and I was going backwards. I had on a heavy coat with a band around the wrist; the second pin below my coat caught in this band. I was going down head foremost. That turned my feet over and I started down feet first. I reached with my left hand, and grabbed the pin on the side of the pole, and came down with a jerk, and hurt my back, and I was terribly shaken up; but I went over and took care of the passenger trains; then went back there, and went up the pole, took the lantern with me, and took the pin, and drove it in with a big monkey wrench I had in the shanty. I stood next to the top rung on the east side of the pole when I fell; there was a rung higher up on the other side. I drove the rung in because I had to use the same, and I had instructions from the master mechanic that when anything went wrong to fix it. There was one of those cables broke."

He testified that the semaphore was a straight pole, about six and one half or seven inches in diameter, and set into the ground. "There were pins on each side, four feet apart, so arranged that from a pin on one side to the next pin on the other side the space would be two feet. Then on the top there was a blade that swung on a pivot. At that time

there was a cable wire that came from one end of the blade to the bottom, where there was a lever fixed, by raising and lowering which it throws that semaphore in different positions. The rung I now have I took out of that semaphore pole. Don't know whether I had been up that distance before on that pole or not. Had been up other poles three or four times a night. The night I fell from the pole the weather was sleety, rainy-like, dark, and cloudy. After I fell from the pole I went over to the Union Depot and took care of the passenger trains. Then I went back and fixed the pole. After I fixed the pole I went back to the Union Depot; told the night watchman I didn't see what was the matter with me; I had such a funny griping in there, and put my hand here on the left groin to show him where, and I got instant relief. I went to the office, and took my clothes down, and saw there was a bunch there, and at 7 o'clock in the morning I went home, and put some liniment on my back, and went to bed. On the morning of January 28th I called Dr. David. I tried to get a lay-off several times, but the yardmaster told me a lay-off was equivalent to a discharge, and so I worked until the morning of the 28th. Since the accident, have had pains across the small of my back. They keep me nervous all the time, and when the truss works down there seems to be a joint there that seems tender. It all unnerves me. I cannot do anything until I remove it. In bright clear weather it is not so bad, but very severe in cloudy weather. I am a carpenter by trade. Cannot do any heavy work now, for when I try to do it this rupture is coming out all the while between the truss and that large bone, and affects my back."

On cross-examination he testified that he weighed 145 pounds. Could not see well. That his sight was perfect in December, 1895. In December, 1895, weighed 160 pounds. Never had any difficulty except this night. "Sometimes, on the other poles, when the light was extinguished, I would take

the lights up and light them up there, but if it was windy I would come down, and get down behind a shanty or box car. When I went to light the lamp, I reached out for it, and had taken it out with the right hand, and transferred it to the left hand, for the purpose of striking a match to light the lamp. I was standing at that time with my right foot on the rung below the top rung, my left leg swung right around the pole,—my heel, of course, couldn't catch very much,—and my left arm around the pole. This would bring the top rung about opposite my breast. I then took a match out of my pocket with my right hand, and took hold of the part of the rung that turned up with the little finger and the next one, to light it, and was scratching the match held between the index finger and thumb, up the main bar of the rung, and merely scratching the match, it turned around and came out. I suppose I must have put some weight upon it. I was in a hurry. The rung came out and I was precipitated backwards. It isn't a fact that I didn't rest any weight on the right hand,—merely took the match out and scratched it without any heft being there, or anything to interfere with my standing there. The rung didn't seem loose; didn't seem to wiggle in the hole when I first took hold of it. Could not say whether it was loose or not. I know it turned down. I put weight upon it, but don't know how much. Can't tell whether it was considerable weight or whether it would be bearing down directly or sideways. Put my right hand on rung to help hold myself. Had hold of the rung before and while I lit the match. After I struck the match, I had to reach around with my right arm, and virtually let go with my left arm. Can't tell exactly how long the match was on the rung before it turned. It was done so quick I couldn't tell. I think the match was lit when the rung turned. I was trying to light the lamp when the wind was blowing. I had to light that light quick."

On redirect examination he testified that he was never up to this rung in the daytime, and when he was up in the night could not see whether it was securely fastened or not; that he returned, and took the rung to the top of the pole, and drove it in with a monkey wrench; that it went in easy; that he took the pin, and stuck it in the hole as far as it would go, and then took a monkey wrench, and hit it five or six times with the wrench; that when the rung turned he tried to catch himself, and to hold his balance, but fell backwards; that it turned before he started to fall, and just as soon as it turned around and came out he fell over backward.

There was medical testimony produced showing the nature and character of the injury the plaintiff sustained.  Dr. David testified that hernia is always very troublesome, and may induce pain from the pressure of the truss, even though the truss holds it up, causing radiating pains and varicocele. It is apt to become larger and more troublesome, and might be irreducible.  It might come down, and it would be impossible to put it back, and then he would have to have an operation, and cut it open in order to reduce it.

After the plaintiff had rested, the defendant moved for a nonsuit on the ground that the testimony failed to show that the defendant was guilty of negligence, which motion was denied.

One Gallagher, the foreman under whose supervision the semaphore in question was put up, testified that he and Mr. Hanson and Dobson did the work.  Hanson did the ironwork, and drove the pins in.  There were six holes bored on one side and seven on the other side.  The holes were half an inch in diameter, about two inches deep, and four feet apart.  The rungs were drawn out flat at the end driven in, so that when they drove them in they would not turn. They bored the holes half an inch with a half-inch bit, so as not to split the pole.  Dobson bored most of the holes, he

thought. The yardmaster testified that he never knew of a man going up there and getting a lamp and trying to light it up there. After the accident they brought them down. That he always supposed they brought them down before. Never gave them any instructions in regard to it. Either the blacksmith, Dobson, or one of the three, drove the rungs into the poles at the Eastern Minnesota crossing while the poles were on the ground. There was other testimony to the same effect, and that the rungs were driven in before the poles left the shop. They were four in number. Another witness testified that he was with the gang when they put the pole up, and that at the time the pole was put up there were no rungs or pins put in the pole. Another witness testified that at the time the poles were loaded on the car, and sent away to be put up, there were no rungs driven in them, and that there were none in the pole in question when raised, because he helped to load them on the cars. One 'Alfson testified substantially to the same effect.

The defendant asked the court to instruct the jury that the fact, if it be a fact, that the plaintiff " immediately replaced and drove the rung, which he testifies came out, into the semaphore pole, and that such action upon his part rendered it impossible to procure evidence other than his own of the condition of said rung and pole at the time of the alleged injury, then it becomes your duty to weigh the evidence of the plaintiff as to the condition of said pole and rung at the time of the alleged injury with great caution, and all reasonable presumptions from the evidence in this case must be against such testimony of the plaintiff." The court refused to give said instruction as asked, but gave all except the concluding clause, " and all reasonable presumptions," etc.

The jury found a special verdict as follows: " (1) Did the plaintiff receive the injury of which he complains while in

the employ of the defendant? *Ans.* Yes. (2) If you answer the first question 'Yes,' then was such injury caused by any want of ordinary care on the part of the defendant? *A.* Yes. (3) If you answer the second question 'Yes,' then was such want of ordinary care on the part of the defendant the proximate cause of the injury? *A.* Yes. (4) Was the plaintiff guilty of any want of ordinary care which contributed to the injury of which he complains? *A.* No. (5) What sum of money will compensate the plaintiff for the injury of which he complains? *A.* $1,200." A motion was made to set aside the verdict, and for a new trial, upon the grounds specified in the bill of exceptions. The court overruled said motion, and judgment was rendered on the verdict in favor of the plaintiff and against the defendant for the sum of $1,301, from which the defendant appealed.

For the appellant there was a brief by *Pope & Perrin*, and oral argument by *Carl C. Pope*. They contended, *inter alia*, that the instruction, given at the request of the appellant, to the effect that, if the testimony of the respondent relative to the manner of his falling was against all reasonable probabilities, the jury would not be warranted in finding that he fell from the pole and received the injuries of which he complains, was correct. *Payne v. C., R. I. & P. R. Co.* 39 Iowa, 523; *Thompson v. Pioneer-Press Co.* 37 Minn. 285; *Badger v. Janesville Cotton Mills*, 95 Wis. 599. But in the general charge the court had laid down a different and incorrect rule when it said that "if the things testified to are so unnatural or unreasonable that your good sense revolts against them, you *may* reject such testimony as untrue, although not contradicted." The giving of this charge was a substantial error, and was not cured by giving the special instruction asked by the appellant. *Hutchinson v. C. & N. W. R. Co.* 41 Wis. 541, 557; *Ward v. Henry*, 19 id. 76; *Sears v. Loy*, id. 96; *Imhoff v. C. & M. R. Co.* 20 id. 344; *Smith v.*

*Hardy*, 36 id. 417, 423; *McCabe v. Hammond*, 34 id. 590; *Little v. Superior R. T. R. Co.* 88 id. 402, 408.

For the respondent there was a brief by *Thorson & De La Motte*, and oral argument by *T. M. Thorson*.

PINNEY, J. The principal matter presented involves questions of fact peculiarly appropriate for the consideration and determination of a jury. It is urged that there was no sufficient evidence that the defendant had been at fault, or was guilty of any negligence which was the proximate cause of the plaintiff's injury. It was claimed that the semaphore, by a fall from which the plaintiff sustained his injury, was negligently and improperly constructed, in that the iron rungs by which the operator of it could ascend the semaphore to attend to the practical operation and working of the same, had not been safely and securely driven into the pole, so that the operator could go up the pole and perform his duties in safety; and that, in consequence, one of the rungs slipped or came out, so that the plaintiff, when in the discharge of his duties as such semaphorist, and without fault or neglect on his part, was violently thrown, while near the top of such signal or semaphore pole, to the ground, and received his injuries, which the evidence shows were serious. The credibility of the plaintiff as a witness in his own behalf was assailed, and it was alleged that the evidence was extremely improbable, and that he was unworthy of credit. The evidence, as contained in the record, seems quite clear and satisfactory to show that the plaintiff received the injury of which he complains at the time and place stated by him, and there is evidence in corroboration of his claim as to the manner in which it occurred. The nature and character of the injury is shown by the evidence of his physician who was called to attend him the next day. The testimony of the physician shows that the injury was

of a serious and dangerous character, and there were other facts and circumstances tending to sustain the plaintiff's version of the occurrence. There is no apparent reason for believing that his injury was self-inflicted or simulated, or that it was not received in the regular discharge of his duty, while in the service of the defendant as a semaphorist, at the place indicated in the testimony.

The case has been tried twice, and the last trial was apparently a thorough and careful one; and it may be remarked that the findings of the jury upon which the judgment rests were satisfactory to the trial judge, for the defendant's motion to set aside the verdict and for a new trial on the ground that it was contrary to, and not sustained by, the evidence, was denied. The credibility of the plaintiff as a witness in his own behalf was a question peculiarly for the jury, and no case is made upon which the defendant can rightly or fairly insist that the plaintiff, as a matter of law, was not a credible witness, or that the evidence, and the inferences that may properly be drawn from it, does not, when fairly considered, support the verdict. The defendant's witnesses testified that the iron rungs were driven into the pole, where holes had been bored with a bit, before the pole was raised, and the plaintiff's witnesses testified that the rungs were driven in after it was brought to the ground and raised; affording ground for the contention that the rung in question had not been driven in securely or had failed to receive proper attention. The plaintiff testified that in about three quarters of an hour after the injury he drove this rung in again securely; and it is assumed that if, on this point, he testified truly, he destroyed the means of corroboration, and, if falsely, he put it out of human power to contradict him. We fail to see anything in the evidence to warrant this conclusion. Certainly there is no evidence that in reason would justify the conclusion that upon receiving his injury, in the darkness and storm of the night, he purposely attempted to

suppress or destroy the evidence to show how his injury occurred.

The court instructed the jury that: "The fact, if it be a fact, that the rung came out in the manner testified to by the plaintiff, is presumptive of the want of ordinary care on the part of defendant.    That is to say, *if there were no other evidence in the case of how the semaphore was constructed,*— as to the manner and degree of care exercised in putting in the rungs,— we would have to conclude that it was imperfectly constructed from the fact of its being loose when plaintiff took hold of it, *if in fact* it was loose, as he testifies."    As thus limited and qualified, we do not see how it can be said that the instruction was either beneficial to the plaintiff or prejudicial to the defendant, or that it was reversible error.    The questions before the jury were of fact, not depending on legal judgment, and were fairly left to them.

Complaint is made that, although the court correctly instructed the jury that, if they found from the evidence that the testimony of the plaintiff relative to the manner of his falling from the semaphore pole was against all reasonable probabilities, then, and in that case, they would not be warranted in finding that he fell from the pole and received the injuries of which he complains, and they must, therefore, answer the first question of the special verdict " No," thus leaving the question to the judgment of the jury as to the reasonable probabilities, yet, in the general charge, the jury had been told that: " In passing upon the testimony of a witness, you are not to accept it as true simply because not contradicted by other witnesses.    If the things testified to are so unnatural or unreasonable that your good sense revolts against them, you may reject such testimony as untrue." [1] It is not pointed out in what manner the defendant was prej-

[1] A clerical error in this sentence as it appears in the original opinion on file has been corrected by direction of the justices.— REP.

udiced or injuriously affected by the alleged erroneous instructions. They do not invoke any clear, definite rule as a guide to the jury. They refer to the conception the jury may have of "reasonable probabilities,"— of what is unnatural or unreasonable,— so as to make the good sense of the jury revolt at it.

The court refused to instruct the jury at the defendant's request that, if the plaintiff had equal means and opportunity for ascertaining the defect, if they found there was a defect, in the semaphore of which he complains, as the defendant, then, in that case, the plaintiff cannot recover in this action. In view of all the evidence, and the fact that the defendant constructed and erected the semaphore, we think the refusal was not error.

It was the duty of the defendant to provide a reasonably safe place for the plaintiff to render his services, and to construct the semaphores so that they would be reasonably safe for the plaintiff's use. *Cadden v. Am. Steel Barge Co.* 88 Wis. 410, 418, 420.. The foreman of the defendant, Gallagher, and his assistants, under and by whom the semaphore was constructed, were not fellow-servants of the plaintiff. The defendant was bound to perform its duty. The plaintiff did not take the risk of the carelessness of those who were selected by the defendant and undertook to do its duty, even though they were servants of the same master. *Laning v. N. Y. C. R. Co.* 49 N. Y. 521; *Ford v. Fitchburg R. Co.* 110 Mass. 241; *Hough v. Railway Co.* 100 U. S. 213–219. The case, in brief, is that there was evidence sufficient to take the case to the jury upon the question of the negligence of the defendant in not properly constructing the semaphore, which was an appliance provided for the plaintiff in performing his services as semaphorist at the place in question for the defendant, and in not providing a safe and sufficient one upon which the plaintiff could so render his services. Here the semaphore was constructed by the defendant itself.

There was evidence strongly tending to show that it was defective and insufficient, and, indeed, the result clearly shows it, and that the plaintiff sustained his injuries in consequence.

At the commencement of the trial a motion was made by the defendant's counsel to quash the array of jurors upon the ground that they were drawn by the clerk of the court from the list of names furnished by members of the county board, and that the law authorizing that method was repealed three days after such drawing, so that the manner of obtaining jurors at the time of the commencement of the term and of the trial was regulated by a subsequent act. Ch. 380, Laws of 1897 (secs. 2533*a*–2533*e*, Stats. 1898). The challenge was overruled. The determination of the court overruling the challenge to the array of jurors was correct. When jurors have been drawn and designated according to law to serve at a term of court, a mere change in the method of drawing jurors thereafter made will not affect those already drawn, but they will continue, notwithstanding such change in the law, legal jurors for the term, unless excused or discharged by the court. *Ray v. Lake Superior T. & T. R. Co.* 99 Wis. 617. We do not think the record shows any error of which the defendant can rightly complain, and that for the reasons stated the judgment is correct and should be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.


BARDEEN, J. I dissent from the decision of the majority of the court, on the ground that plaintiff's statement of how the accident occurred is so improbable as to be beyond belief. He had climbed the semaphore pole. His right foot was resting on one of the rungs. His left leg was thrown around the pole. His left arm was also around the pole, holding the bottom of the lantern in his hand to the right

Welty vs. The Lake Superior Terminal & Transfer R. Co.

of the pole.   While in that position he grasped the projecting prong of the rung on the right, which was about breast · high, with the third and fourth fingers of his right hand, and was scratching a match, when this rung came out, and he fell backwards, turned over once, was caught by his overcoat sleeve on one of the lower rungs, and recovered himself before he reached the ground.   He claims that he was strained and wrenched so as to cause a rupture.   He went back to the depot, eighty or one hundred rods distant, took care of the trains, and then went back to the pole and drove in the rung with a big monkey wrench.   The accident is said to have happened at about 11:30 at night.   This is all the testimony as to how the accident occurred.   To my mind, it needs but a glance at this testimony to demonstrate the utter impossibility of the plaintiff's being injured in the manner he said he was.   His weight must necessarily have been resting on his right foot.   His left leg and arm being around the pole, and the rung that came out being driven into the pole at right angles to the position in which he stood, it seems utterly impossible for him to have rested any weight thereon that would disturb his equilibrium if it gave way. The case comes clearly within the rule that a jury is not warranted in finding the existence of facts, on the positive testimony of a witness, which are contrary to matters of common knowledge or to all reasonable probabilities.   *Badger v. Janesville Cotton Mills,* 95 Wis. 599; *Flaherty v. Harrison,* 98 Wis. 559; *Payne v. C., R. I. & P. R. Co.* 39 Iowa, 523; *Thompson v. Pioneer-Press Co.* 37 Minn. 285.   The judgment ought to be reversed.

MARSHALL, J.   I concur in the opinion of Mr. Justice BARDEEN.